## FYFE *v.* ENGLISH.

APPEAL—REVIEW—CANCELLATION OF MORTGAGE.

Upon a review of the evidence, a decree canceling a mortgage and a sheriff's deed on foreclosure thereof was affirmed.

Appeal from Berrien; Coolidge, J. Submitted October 13, 1897. Decided March 1, 1898.

Bill by Lawrence C. Fyfe, trustee for the heirs of Mary A. Thresher, deceased, against Peter English and James Baley, for the cancellation of a mortgage. From a decree for complainant, defendants appeal. Affirmed.

*Edward Bacon* (*George M. Valentine*, of counsel), for complainant.

*Gore & Harvey*, for defendants.

HOOKER, J. In the year 1877, Mrs. Joseph P. Thresher died seised of a large number of village lots in Thresher's addition to the village of Benton Harbor, including blocks 5 and 6. Her husband, and three children, named, respectively, George, Frank, and Harriet, survived her. Harriet married a man named Fitzgerald. As the children became of age, they gave powers of attorney to their father, authorizing him to convey or mortgage the premises. They were dated as follows: George's, December 22, 1881, revoked June 3, 1892; Frank's, May 10, 1887, and March 1, 1889, revoked May 18, 1892; Harriet's, July 22, 1889, revoked July 30, 1892. Joseph P. Thresher seems to have had or claimed some interest in the premises, though what the claim was, or how it arose, does not appear. On August 13, 1891, Joseph P. Thresher, acting for himself and as attorney for the three children, made and delivered to Peter English a promissory note for $1,250, due in four months, with interest at 8 per cent.,

payable annually, until paid. It was secured by a mortgage upon block 5 of the Thresher addition. The mortgage shows that the note and mortgage were given to indemnify English against loss through his indorsement of a note for a like sum, given by Thresher, on behalf of himself and children, to the First National Bank of Benton Harbor, about the same time, to procure some money for Frank Thresher. The bank note was not paid at maturity, but was renewed as follows: November 18, 1891, by a note for $1,200, executed by all; March 1, 1892, by a note for $1,200, executed by all; May 14, 1892, by a note for $1,200, executed by all except Peter English; June 24, 1892, by a note for $1,224, executed by all except Frank Thresher. It was paid September 30, 1892, by Peter English, who proceeded to a sale of the property on foreclosure by advertisement. He bid in the property, and afterwards assigned his right to Baley. Before redemption expired, this bill was filed in the interest of the Threshers, and the circuit court, in chancery, made a decree canceling the mortgage and the sheriff's deed, upon the ground, among others, that the obligation had been paid. The defendants have appealed.

To determine whether this decree was warranted, it becomes necessary to understand the business relations of English and the Threshers, which were considerably involved, and include the transfer to English of several parcels of land which the Threshers claim that he never paid for. An outline of these transactions is as follows: On May 18, 1885, the Threshers made a mortgage for upwards of $4,500, upon all of the property, to Lucy M. Dickinson, and on April 29, 1893, this mortgage was assigned to Horace M. Olney. Previous to August, 1891, English had organized the Excelsior Gas Company, and held some of its stock. He and Thresher had become interested in some business affairs, and Thresher had deeded to him lots 5 and 16, block 6, the consideration mentioned in the deed being $800. On behalf of Thresher it is claimed that these lots were never paid for, and

he testified that the only money that English ever paid him, that he could recall, was the sum of $1,500, which will be explained later. English testified that on January 15, 1891, he paid Thresher by check $500, and that this was secured by chattel mortgage, and was finally repaid by the deed mentioned, dated March 4, 1891. The check was produced upon the hearing. In December, 1890, English, Thresher, and others had associated under the name of the Benton Harbor Improvement Association, for the purpose of advancing the interests of the village, and attempted to incorporate. It is claimed by counsel for the Threshers that they did not organize a valid corporation; but, whether they did or not, it entered into a contract, on May 25, 1891, with Thresher, acting for himself and children, whereby the association conditionally purchased all of the Thresher property, and proceeded to replat it, by a plat called the "Benton Harbor Improvement Company's Third Addition," which was filed in December, 1891. By inadvertence the old plat was not vacated, it is said. It was after the making of this contract, and before the making of the new plat, that the mortgage to English hereinbefore mentioned was made. The Threshers retained possession of the property.

About January 1, 1892, a new scheme was evolved, in which both English and Thresher took a lively interest, —English, because he was a promoter of the enterprise; Thresher, because of its prospective advantage in the disposition of his lots, if for no other reason. The Benton Harbor Land & Improvement Company was formed, with the view to the sale of 1,400 village lots, at the uniform price of $200, regardless of value, the parcels to be distributed by lot among the several purchasers, after all had been sold. Life was to be infused into this project by the building of a large hotel, which was expected to materially advance values. Under this scheme, much of the identical property which was under contract to the Benton Harbor Improvement Company was to be included in the 1,400 lots to be sold by the new company, and it is obvious that

it was necessary that the Threshers should be released from the first contract. This brings us to a transaction whereby 18 lots were conveyed by Thresher to English. The deed was dated January 28, 1892, and the consideration was one dollar. On the same day, and as part of the same transaction, English made a quitclaim deed of the same lots to John Bell, Albert R. Nowlan, J. H. Lee, and J. Stanley Morton, for the nominal consideration of one dollar. Lee, at least, was a director of the improvement association, and it is said that all were, and English testified that he acted for the accommodation of the association and Thresher, and received no personal benefit or interest in the land conveyed. This is a portion of the property conveyed to English for which counsel for the complainant claim that he did not pay. English testified that it was conveyed by Thresher in payment for $5,000 stock, for which Thresher was indebted to the association. There is other testimony to the same effect. Two days later, on January 30, 1892, a contract was made between English and the Threshers, in furtherance of the scheme. This contract was in writing, and by its terms the Threshers were to sell to English 158 lots, being a portion of the property originally contracted to the improvement association, and perhaps all, with the exception of the 18 lots deeded two days before. For this property English was to pay $52,500, as follows: $1,500 on the signing and delivering of a duplicate of the contract, $25,000 on or before August 1, 1892, and $26,000 on or before January 1, 1893. English gave his notes for the last two payments. English also agreed to give a bond for $5,000 as security, and for liquidated damages in case of his failure to perform. Title was not to pass until one-half of the consideration was paid. The contract contained the further provision:

"Also, that this agreement is wholly contingent upon a settlement being made with the Benton Harbor Improvement Association, and cancellation of a certain contract for same premises here named between them and aforesaid first party. If no settlement can be amicably made, this instrument becomes void. And it is further agreed

that the party of the first part hereby conveys to the party of the second part the right to sell four of the above-described lots for the purpose of making the first payment of $1,500 to the party of the first part on the said property, if sold at actual value, and first payment is made on delivery of this contract."

The premises were to be conveyed "free and clear from all incumbrances whatever, by good and sufficient warranty deed."

On February 1, 1892, English drew his check for $1,500, which was paid on February 3d. On February 4th the Threshers conveyed to English four lots,—1, 2, 17, and 18, block 7. The consideration mentioned in the deed was $1,500. On the same day they conveyed to him the west half of lots 11 and 12, block 8, the west half of lots 5 and 11, and the west fraction of lots 6, 7, 8, 9, and 10, block 17, being all the lands east of Nowlan street. The consideration stated in this deed was one dollar. English testified that the fractions and parcels east of Nowlan street were conveyed as a part of the same transaction in which the four lots were conveyed, and were part of the property conveyed to enable him to raise the first $1,500 payment under the contract, and that such was the understanding between him and Thresher. Thresher stated that English sold lots and raised the $1,500, but could not state what lots they were. His counsel claim that the lots conveyed to English on February 4th produced more than $1,500. The record shows that the four lots were sold by English to Fifield for $1,800, and the land east of Nowlan street to Lee for $1,000. The bond mentioned in the contract of January 30th was not given, but in lieu thereof English delivered 100 shares of Excelsior Gas Company stock, of the par value of $10,000.

The hotel scheme was a failure, and the affairs between the improvement association and the Threshers remained unsettled, and the whole land improvement project appears to have been abandoned. May 14, 1892, Thresher deposited the gas stock in bank as collateral security for

his obligation. A quarrel arose between Thresher and his children, and, as already stated, on May 18, 1892, Frank Thresher revoked his power of attorney, and like action was taken by George on June 3, and Hattie on July 30, 1892. The payment upon the English contract was not made when it fell due, on August 1, 1892. On August 26th, Thresher's children commenced a suit in chancery against him. A written indorsement, signed by Thresher and English, appears upon the contract, extending the time for making payment one year. It is dated May 17, 1892, being the day before the first revocation of the power of attorney. English testified that he signed this indorsement some time in September, at the request of Thresher, to aid him in his suit with the children, to which English was made a party defendant. English was promptly informed of the revocation of the power of attorney, and Baley was directed not to deliver the gas stock to any one without an order from the younger Threshers. This occurred before the bill was filed. An answer was filed on behalf of English (though he says it was without his knowledge or instigation), admitting the executing of the contract, but alleging that nothing was due thereon, and "that on or about May 17, 1892, a valid contract was entered into by and between this defendant and Joseph P. Thresher, by which the time of payment on said contract was extended on the payments provided for in said contract for one year." On or about September 30, 1892, English obtained from Thresher an order, of which the following is a copy ·

"JAMES BALEY,
      "Cashier First National Bank,
                              "Benton Harbor, Mich.
    "*Sir:* Whereas, on or about the 14th day of May, 1892, I deposited in your bank 200 shares of stock of the Excelsior Gas Company as collateral to a joint note made by myself as attorney in fact for George M. Thresher, Mrs. Hattie D. Fitzgerald, and Frank L. Thresher, and myself, and which stock was standing in the name of Peter English, and was not assigned by him; and where-

as, the purposes for which he left said stock with me have been accomplished, and I have no interest in it, either as attorney for the above-named parties or myself: Now, therefore, you are hereby instructed to deliver the same to Peter English.

[Signed]    "J. P. THRESHER."

Thresher says that this was delivered upon a promise by English that he would pay the $1,224 note at the bank, and the agreement to return the stock to him as soon as acquired. English claims that he was about selling the gas works, and needed this stock to transfer, and that Thresher knew and assented to this, and that there was no promise to assume and pay the note, and thereby relieve the Threshers from liability thereon, or to return the stock to Thresher. English did pay the note in order to get the stock, and received the stock from the bank. October 15, 1892, Frank Thresher conveyed his interest in the property to Ankeny. In May, 1893, Mr. George S. Clapp, counsel for the Threshers, on their behalf, presented to English a writing admitting that the contract of January 30, 1892, was canceled, and containing a release of all claims against the Threshers, with the request that he sign it. This was refused. In October, 1893, English began foreclosure, and in January, 1894, received the sheriff's deed, and in October, 1894, he assigned his interest to Baley. In November, 1894, Thresher and his children settled their difficulties. During the time intervening between January 30, 1892, and January 11, 1894, a controversy existed between the improvement association and the Threshers over their respective rights. This does not appear to have been settled. The Olney mortgage was never paid. Fyfe, the complainant, is a trustee under a deed from the proper parties, and he filed this bill for the "cancellation of the mortgage, adjustment of equities, and an accounting."

The learned circuit judge who heard the cause filed an opinion, in which he stated his conclusions of fact. He gives prominence to the confidential relations which

existed between Joseph P. Thresher and English. It is stated therein that the contract became forfeited, and English thereby became liable to Thresher in the sum of $5,000 as liquidated damages, the gas stock being chargeable as security therefor; and that in May, 1892, this stock was deposited as collateral by Thresher, with the consent of English, and that the order for the stock was delivered to English upon the promise to pay the $1,224 note. The opinion also states that English sold lots and received money for them in excess of the $1,500, and re_ ceived $1,000 for Thresher's stock in the association.

The case was elaborately argued in both courts, and, to our minds, there is ample justification for the decree made by the learned circuit judge. We are of the opinion that his decree should be affirmed, with costs; and it is so ordered.

The other Justices concurred.